**In the Matter of the Termination of the Parent–Child Relationship of I.A., Minor Child,**

**Lavonne Aikens (Mother), Appellant–Respondent,**

**v.**

**Indiana Department of Child Services., Appellee–Petitioner.**

**No. 02A05–0811–JV–660.**

Court of Appeals of Indiana.

March 23, 2009.

Daniel G. Pappas, Fort Wayne, IN, Attorney for Appellant.

Alisa L. Rude Indiana Department of Child Services, Fort Wayne, IN, Attorney for Appellee.

## OPINION

VAIDIK, Judge.

### Case Summary

Lavonne Aikens ("Mother") appeals the termination of her parental rights to her son, I.A., who was almost two years old at the time of the termination hearing, had never been in her care, and has many medical needs. In the same proceeding that the trial court terminated Mother's parental rights to I.A., however, the court did *not* terminate Mother's parental rights to four of her older children, M.H., Z.A., D.A., and J.A. This case presents a most unusual circumstance where, in the same proceeding, the court terminates a parent's rights to one child but not to others. Although at the time of the termination hearing Mother had successfully completed many services and was cocaine-free for eight months to the point of getting four of her children back, the record shows that Mother has nevertheless demonstrated a continued indifference to I.A.—ranging from using cocaine during the whole nine months of her pregnancy with him, to not knowing the extent of his medical conditions at birth, to not educating herself on his current medical needs. We therefore affirm the termination of Mother's parental rights to I.A.

### Facts and Procedural History

Mother began using cocaine in 1988 or 1989 when she was nineteen years old. Except for a short break from 1999 to 2001, Mother used cocaine from then until the termination petition was filed in this case in 2007. Mother has nine children, five of which were listed in the termination petition that is the subject of this appeal, I.A., M.H., Z.A., D.A., and J.A. I.A., the youngest, was born on August 22, 2006, and tested positive for cocaine at birth.[1] Mother used cocaine during the entire nine months of her pregnancy with I.A. I.A. had numerous problems at birth, including extra digits on both hands, a heart murmur, right ventricular enlargement, pulmonary stenosis, organic encephalopathy, a disfigured scalp, one of his ears was fully attached to his scalp, and his neck leaned to one side.

About one month after I.A.'s birth, on September 20, 2006, the Allen County De-

---

1. J.A., who was born in 1999, also tested positive for cocaine at birth. As a result, Mother was involved with the Illinois equivalent of the Department of Child Services for six months following J.A.'s birth. Tr. p. 38–39. Mother did not use cocaine from 1999–2001. She started using cocaine again when she moved from Illinois to Indiana in 2001.

partment of Child Services (DCS) filed a petition alleging that the children were in need of services (CHINS).[2] Specifically, the DCS alleged that I.A. tested positive for cocaine at birth, Mother thereafter tested positive for cocaine, and that Mother is unable to provide appropriate care and supervision for her children due to her drug addiction and that she needs professional help that she will not receive without court intervention. The court determined the children to be CHINS. Following a disposition hearing, I.A. was placed in licensed foster care and I.A.'s siblings were placed in relative care and then later licensed foster care apart from I.A. A parent participation plan was entered that ordered Mother to, among other things, cooperate with DCS caseworkers, refrain from using illegal substances, submit to a drug and alcohol assessment and a psychological evaluation and follow all recommendations, enroll in and regularly attend Alcohol/Narcotics Anonymous meetings, complete parenting classes, enroll in and complete home-based services, establish paternity, and regularly visit with her children.

Mother was allowed to visit with her children as a group every Tuesday for two hours at SCAN. At the time of a periodic review hearing in January 2007, the trial court determined that Mother was in compliance with the dispositional decree. However, in June 2007, the court found that Mother was no longer in compliance. That is, starting in June 2007, Mother had a relapse wherein she started using cocaine again and stopped participating in services, including missing several visits with her children. As a result, on September 13, 2007, the DCS filed a petition to terminate Mother's parental rights to I.A., M.H., Z.A., D.A., and J.A.

After the DCS filed the termination petition in September 2007, Mother had to be re-referred for services. Ever since the termination petition was filed, Mother has made efforts to engage in services. For example, she has successfully completed a substance abuse evaluation and treatment program, and she resumed visits with her children.

A two-day termination hearing was held in April 2008. Mother testified at the hearing that she had been "clean" for eight months. Tr. p. 55. Mother also testified about I.A.'s medical problems at birth. She first expressed confusion over the number of fingers that I.A. has. She initially said "nine," then "ten," then "twelve," and finally settled on "eleven." *Id.* at 42. When asked whether I.A. had breathing or heart problems at birth, Mother said only "breathing problems." *Id.* When asked what other problems I.A. had at birth, Mother said *"I don't know."* *Id.* at 43 (emphasis added). When the attorney for the DCS pressed Mother with the following question, "You don't know what his issues were when he was born," Mother answered, "No, he wasn't eating good." *Id.* Mother acknowledged that she was made aware of I.A.'s medical needs and was asked to take a blood test to assist with his diagnosis, but she refused. *Id.* at 52. Mother gave no good reason for her refusal.

Mother also testified about her knowledge of I.A.'s current medical needs:

Q: And finally, Ms. Aikens, do you know, on a day to day basis, what type of medical treatment or regimen[ ] that [I.A.] needs to go through?

A: No, I do not.

Q: You do not? Do you know if he's on any medicines?

---

**2.** Although the CHINS petition lists eight of Mother's nine children, this opinion focuses on the five children listed in the termination petition.

A: Yeah, he's on medicine, he's on breathing machine.

Q: Do you know the names of his doctors?

A: No, I don't.

Q: Do you know if—

A: He's in foster care, they don't give me that right.

Q: Do you know if he goes to therapy or—

A: Yeah, last I heard he was going to therapy.

Q: What type of therapy, do you know?

A: I don't know.

Q: You don't know?

A: He's in foster care, they don't give me that right. They used to tell me about it, his foster parents, but they don't no more.

Q: Do you receive reports from the Department of Child Services—

A: No, I do not.

Q:—concerning your children?

A: No.

Q: Do you know how to contact Stacey Isenbarger [DCS family case manager]—

A: Yeah.

Q:—at the Department?

A: Yes, I do.

Q: And does she return your phone calls?

A: She might.

Q: She talk to you on the phone?

A: Yeah.

Q: And if you ask her questions, does she try to get you the answers?

A: Yes.

Q: *So you could have asked her some of these questions?*

A: They used to tell me when they came to take [I.A.] to the visits; they don't do that no more. They used to tell me what doctor he was seeing, they used to give me pictures; they don't do that any more. They the one told me about his heart problems, that's how I knew that. All conversation was cut between us. They just drop him off and leave.

*Id.* at 59–61 (emphasis added). Notably, Mother was not responsive to the DCS's attorney's final question of whether she could have contacted Family Case Manager Isenbarger to obtain information about her son.

Isenbarger, as suggested, was very knowledgeable about I.A.'s current medical needs. Isenbarger testified that I.A. undergoes both physical and occupational therapies. She said that I.A. wore a helmet on his head to try to correct the scalp malformation, which did not work, leaving surgery as the only option. He sees a breathing specialist every three to four months and undergoes breathing treatments daily, as often as three times per day. Isenbarger explained that the basic medicines used for the breathing treatments are Albuterol and Pulmicort, but if he is sick, then Qvar and Singulair are added. I.A. sees a cardiologist every six months and also undergoes heart tests. In addition, I.A. saw a genetic specialist, Dr. Bader, and was diagnosed with Noonan's Disorder, a genetic disorder. Dr. Bader could not rule out additional problems for I.A. Finally, I.A. has a sensitive immune system. As of the date of the termination hearing, I.A., who was approximately four months shy of his second birthday, was getting ready to start speech and developmental therapies. Isenbarger opined that it was in I.A.'s best interests for Mother's parental rights to be terminated "[d]ue to the nature of [I.A.'s] health concerns" and "the fact that he's also been in foster care for the first almost two (2) years of his life and he's formed a bond." *Id.* at 122; *see also id.* at 124. When

asked if the bond was strong, Isenbarger responded yes. In addition, Isenbarger added that the foster parents have been responsible for taking I.A. to his doctor and therapy appointments. The Guardian Ad Litem also testified at the termination hearing that termination was in I.A.'s best interests given his health issues and the great job his foster parents have done in stabilizing the significant health problems with which I.A. was born. *Id.* at 204. In short, the Guardian Ad Litem testified that I.A. has "thrived" with his foster parents. *Id.* at 205.

Mother's attorney then presented the following closing argument to the court:

Your Honor, this is my *Sophie's Choice* case, if you will. I've been contacted by Andy Goeglein with regard to the adoption of [I.A.] and provided with consents for that and have had them, have discussed that last week with my client, this week, and *frankly, I—I—professionally, I—I—I see [I.A.] in a little bit different basket than the other children with regard to my client simply because [I.A.] presents some different needs;* and the fact is, [I.A.'s] not been in the care of my client since his birth, whereas the other children have been, and I—I know that my client has come a very, very long way from where she was even a year ago with regard to her addiction. She's taken positive steps for herself and for her children and I think, you know, that's born out by the testimony of all the witnesses that you've heard. The—the risk is, of course, another relapse, but this was not a case where she wasn't providing for the children in—in material needs; in fact, you've heard the testimony, she still does, she still brings food over to them at these visits. It's a case where [I.A.] was born and tested positive for these controlled substances, and then the children—the older children had been involved in the juvenile

system, the delinquency system. All the children were removed as a result of—of [I.A.'s] birth and—and his positive screen when he was born. I do not believe that the parental rights of my client should be terminated with regard to any of the children; *however, I'd be understanding if the Court were to terminate with regard to [I.A.], simply because of those things that I've just spoken of.* I would ask the Court to consider all this evidence, as I know you will, and deny the petitions to terminate.

*Id.* at 227–28 (emphases added).

On July 18, 2008, the trial court issued an order terminating Mother's parental rights to I.A. The trial court also entered separate orders denying the DCS's petitions to terminate Mother's parental rights to M.H., Z.A., D.A., and J.A. As for the order terminating Mother's parental rights to I.A., the trial court made the following, pertinent findings:

16. The Mother acknowledges that while pregnant with [I.A.] she was depressed because she did not want another child.

17. The child, [I.A.], has numerous medical and physical challenges. He has extra digits on each hand, he has a heart murmur, his right ventricular valve is enlarged, he has pulmonary problems, his scalp is disfigured, and he has restricted motion in his neck. He has a sensitive immune system. He is diagnosed as suffering from Noonan's Disorder/Syndrome.

18. [I.A.] requires physical and occupational therapies. He has had to wear a skull cap to correct his deformity. He needs breathing treatments. He is on medications and must regularly visit a cardiologist. The Mother has had little or no involvement in his medical care. On one occasion the Mother was to sub-

mit to a blood test to aid in [I.A.'s] diagnosis. However, she did not follow through.

19. The Mother has claimed that the stressors of the Court hearings have been the cause of her prior relapse into drug abuse. The Court questions, then, whether she will be able to withstand the stressors and rigors associated with the demands that [I.A.] has for his care were he to be placed with his Mother.

20. [I.A.'s] special and on-going needs distinguish his case from that of his siblings.

21. The child has progressed well in his present placement.

Appellant's App. p. 230. Accordingly, the trial court concluded:

4. By the clear and convincing evidence the court determines that there is a reasonable probability that the reasons that brought about the child's placement outside the home will not be remedied *and* that continuation of the parent-child relationship poses a threat to [I.A.'s] well-being. The Mother has not availed herself of the training needed to provide for [I.A.'s] medical needs. When needed for the diagnosis of his condition the Mother was not cooperative. She has until recently abused drugs and has admitted that the stressors in her life have contributed to her relapses in the past. Care for [I.A.] will place significant demands on her time and energy. The child's condition is fragile. He should not be placed in an environment that cannot or will not be able to regularly and consistently meet his medical and physical needs. While the Mother had made progress under the Dispositional Decree there is no evidence by which this court can conclude that she has prepared herself to meet [I.A.'s] needs.

The Child can better achieve permanency and the care that he needs in an adoptive home.

5. Termination must be in the child's best interests and the petitioner must have a satisfactory plan for the care and treatment of the child.... In this case the Guardian ad Litem has concluded that adoption is in the child's best interests. The court concludes that through termination of the parent[-]child relationship, the child can be placed in a safe permanent home that is well equipped to meet his special needs. Thus the child's best interests are served by granting the petition to terminate the parent-child relationship. The adoption of the child is an appropriate plan.

*Id.* at 231 (emphasis added). Thus, the trial court terminated Mother's parental rights to L.A.[3] Mother now appeals.

**Discussion and Decision**

 Mother contends that the trial court erred in terminating her parental rights to I.A. when it did not do so with regard to M.H., Z.A., D.A., and J.A. The traditional right of a parent to establish a home and raise her child is protected by the Fourteenth Amendment of the United States Constitution. *Bester v. Lake County Office of Family & Children*, 839 N.E.2d 143, 147 (Ind.2005). Parental rights may be terminated when a parent is unable or unwilling to meet her parental responsibilities. *Id.* The purpose of terminating parental rights is not to punish a parent but to protect the child. *In re L.S.*, 717 N.E.2d 204, 208 (Ind.Ct.App.1999), *reh'g denied, trans. denied.*

 This Court has long had a highly deferential standard of review in cases concerning the termination of parental

---

**3.** The court also terminated the alleged Father, Leroy Shelton's, parental rights to I.A.

However, this appeal only involves the termination of Mother's parental rights to I.A.

rights. *In re K.S.*, 750 N.E.2d 832, 836 (Ind.Ct.App.2001). Thus, when reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *Bester,* 839 N.E.2d at 147. We will consider only the evidence and reasonable inferences therefrom that are most favorable to the judgment. *Id.* When reviewing findings of fact and conclusions thereon in a case involving termination of parental rights, we apply a two-tiered standard of review. *Id.* First, we determine whether the evidence supports the findings. *Id.* Then, we determine whether the findings support the judgment. *Id.* The trial court's judgment will be set aside only if it is clearly erroneous. *Id.* "A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment." *Id.* (quoting *In re R.J.*, 829 N.E.2d 1032, 1034 (Ind.Ct. App.2005)).

■ Indiana Code § 31–35–2–8(a) provides that "if the court finds that the allegations in a petition described in [Indiana Code § 31–35–2–4] are true, the court shall terminate the parent-child relationship." Indiana Code § 31–35–2–4(b)(2), in turn, provides that a petition to terminate a parent-child relationship involving a child in need of services must allege that:

(A) one (1) of the following exists:

(i) the child has been removed from the parent for at least six (6) months under a dispositional decree;

(ii) a court has entered a finding under IC 31–34–21–5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made; or

(iii) the child has been removed from the parent and has been under the supervision of a county office of family and children for at least fifteen (15) months of the most recent twenty-two (22) months;

(B) there is a reasonable probability that:

(i) the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied; *or*

(ii) the continuation of the parent-child relationship poses a threat to the well-being of the child;

(C) termination is in the best interests of the child; and

(D) there is a satisfactory plan for the care and treatment of the child.

(Emphasis added). The Department of Child Services must establish these allegations by clear and convincing evidence. *Egly v. Blackford County Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1234–35 (Ind. 1992); *Doe v. Daviess County Div. of Children & Family Servs.*, 669 N.E.2d 192, 194 (Ind.Ct.App.1996), *trans. denied.*

Mother first argues that the DCS has failed to prove both that there is a reasonable probability that the reasons for I.A.'s placement outside the home will not be remedied *and* that the continuation of the parent-child relationship poses a threat to I.A.'s well-being. We first note that Indiana Code § 31–35–2–4(b)(2)(B) is written in the disjunctive. Thus, the DCS was required to establish, by clear and convincing evidence, only one of the two requirements of subsection (B). *See L.S.*, 717 N.E.2d at 209. Here, although the trial court found both prongs of subsection (B) were satisfied, only one was necessary in order to terminate Mother's parental rights. Therefore, we only address whether the DCS has proved by clear and convincing evidence whether there is a reasonable probability that the reasons for

I.A.'s placement outside the home will not be remedied.

## I. Reasons for Placement Outside the Home Will Not be Remedied

 The DCS placed I.A. outside Mother's home because I.A. tested positive for cocaine at birth and because Mother was unable to provide appropriate care and supervision for I.A. due to her drug addiction. In short, I.A. was removed due to Mother's indifference to him. To determine whether there is a reasonable probability that the reasons for placement outside the home of the parent will not be remedied, the trial court must judge a parent's fitness to care for her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 512 (Ind.Ct.App.2001), *trans. denied.* The trial court must also "evaluate the parent's *habitual patterns of conduct* to determine the probability of future neglect or deprivation of the child." *Id.* (emphasis added). Pursuant to this rule, courts have properly considered evidence of a parent's criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *A.F. v. Marion County Office of Family & Children,* 762 N.E.2d 1244, 1251 (Ind.Ct. App.2002), *trans. denied.* The trial court may also properly consider the services offered to the parent by a county Department of Child Services and the parent's response to those services as evidence of whether conditions will be remedied. *Id.* Finally, a county Department of Child Services is not required to provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. *In re Kay L.,* 867 N.E.2d 236, 242 (Ind.Ct.App.2007).

Here, in determining that there was a reasonable probability that the reasons for I.A.'s placement outside the home will not be remedied, the trial court stated:

> The Mother has not availed herself of the training needed to provide for [I.A.'s] medical needs. When needed for the diagnosis of his condition the Mother was not cooperative. She has until recently abused drugs and has admitted that the stressors in her life have contributed to her relapses in the past. Care for [I.A.] will place significant demands on her time and energy. The child's condition is fragile. He should not be placed in an environment that cannot or will not be able to regularly and consistently meet his medical and physical needs. While the Mother had made progress under the Dispositional Decree there is no evidence by which this court can conclude that she has prepared herself to meet [I.A.'s] needs. The Child can better achieve permanency and the care that he needs in an adoptive home.

Appellant's App. p. 231. Mother's testimony at the termination hearing reveals that she has made no real effort to learn about I.A.'s medical conditions or his current medical needs. Though she gave birth to him, she was not even sure of his diagnoses at birth. When asked if he had heart or breathing problems at birth, she said only "breathing problems" then followed up with "I don't know" when asked about his other conditions. Tr. p. 42–43. When asked how many fingers I.A. has, Mother wavered between nine, ten, eleven, and twelve. *Id.* at 42. And when doctors asked Mother to give a blood sample to help with a diagnosis, Mother outright refused. When asked why she refused, Mother said, "I don't know. Being foolish." *Id.* at 53. I.A. was eventually diagnosed with Noonan's Disorder.

Mother admitted at the termination hearing that she was unaware of I.A.'s

current medical needs, including the names of his doctors, the names of his medicines, and his therapies. When specifically asked how I.A. is today, Mother casually said "fine." *Id.* at 42. This response denotes an utter lack of comprehension of what challenges I.A. faces, as related in detail by Isenbarger. Mother, however, immediately shifted the blame to I.A.'s foster parents, saying that they used to provide her with this information but quit doing so when she relapsed in the summer of 2007. When the DCS attorney asked Mother if she could have simply called Family Case Manager Isenbarger to inquire about her son, Mother was nonresponsive to this question. Isenbarger, of course, was very knowledgeable at the termination hearing about I.A.'s current medical needs. Though at the end of the termination hearing Mother came back on the stand and expressed a desire to "learn" about I.A.'s needs, *id.* at 221, the truth is Mother has been indifferent to I.A.'s needs all along. Mother abused drugs during the entire nine months of I.A.'s gestation because, in her own words, she was depressed about being pregnant, did not care enough about I.A.'s well-being to learn about his diagnoses after giving birth to him, was not certain how many fingers I.A. has,[4] did not cooperate with doctors in arriving at a diagnosis, and was not even curious enough about I.A.'s current medical needs to pick up a phone and call the family case manager to ask about him. Although we commend Mother for being drug-free at the termination hearing (and hope that she is still drug-free today), kicking a cocaine habit for eight months is one thing. But overcoming a pattern of indifference to a child who has many medical needs is quite another. The DCS has established a reasonable probability that

Mother will not change regarding I.A. The evidence is sufficient to support the trial court's determination that there is a reasonable probability that the reasons for I.A.'s placement outside the home will not be remedied.

## II. Best Interests

Mother next argues that the DCS has failed to prove that termination of the parent-child relationship is in I.A.'s best interests. In determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by the DCS and look to the totality of the evidence. *McBride v. Monroe County Office of Family & Children*, 798 N.E.2d 185, 203 (Ind.Ct.App.2003). In so doing, the trial court must subordinate the interests of the parent to those of the child. *Id.* The trial court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *Id.* In addition, we have previously held that the recommendations of the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests. *In re M.M.*, 733 N.E.2d 6, 13 (Ind.Ct.App.2000); *see also In re A.I.*, 825 N.E.2d 798, 811 (Ind.Ct.App.2005), *trans. denied.*

Here, the trial court determined:

In this case the Guardian ad Litem has concluded that adoption is in the child's best interests. The court concludes that through termination of the parent[-]child relationship, the child can be placed in a safe permanent home that is well equipped to meet his special needs. Thus the child's best interests are

---

4. We note that Mother finally settled on eleven fingers, while the trial court's findings provide that I.A. has extra digits on each

hand, which means that he must have at least twelve fingers.

served by granting the petition to terminate the parent-child relationship.

Appellant's App. p. 231. Mother, however, argues that "the totality of the evidence shows that [she] complied with services such that the court denied the four petitions to terminate her parental rights to the siblings of I.A. The Court speculated as to her inability to care for I.A., in the absence of evidence to support that conclusion, thereby breaking up the sibling group." Appellant's Br. p. 10.

At the time of the termination hearing, I.A. was approximately four months shy of his second birthday and had never been in his mother's care (and he had never been with his siblings on a day-to-day basis). He had been in the care of the same licensed foster parents with whom he had formed a strong bond and who were responsible for taking him to his doctor and therapy appointments. Family Case Manager Isenbarger testified that termination was in I.A.'s best interests. The Guardian Ad Litem testified that I.A. was thriving with his foster parents and that his foster parents had stabilized his medical conditions. The Guardian Ad Litem also testified that termination was in I.A.'s best interests. Perhaps most telling of all was Mother's own attorney's final words to the trial court. After explaining to the trial court that adoption paperwork had already been drawn up, Mother's attorney said:

> I do not believe that the parental rights of my client should be terminated with regard to any of the children; *however, I'd be understanding if the Court were to terminate with regard to [I.A.], simply because of those things that I've just spoken of.* I would ask the Court to consider all this evidence, as I know you will, and deny the petitions to terminate.

Tr. p. 228 (emphasis added). These statements followed a termination trial where I.A. was treated separately—not only by the attorneys but also by the witnesses—from his four siblings. And for good reason. One, I.A. has numerous medical problems, and two, I.A. has never been in his mother's care. This is because Mother has shown indifference to I.A. since before he was even born.

Based on the totality of the above evidence, we conclude that the evidence is sufficient to support the trial court's determination that termination of Mother's parental rights is in I.A.'s best interests.

As a final matter, we highlight that this is a very unusual case. In the same proceeding that the trial court terminated Mother's parental rights to I.A., the court did *not* terminate Mother's parental rights to four of her other children. However, because I.A. has special needs and was treated separately by both parties throughout the proceedings, the judgment terminating Mother's parental rights to I.A. is not clearly erroneous.

Affirmed.

RILEY, J., and DARDEN, J., concur.